JOHN McKEAGUE *vs.* M. NEISSER, *et al.*

IN EQUITY. BEFORE JUDD, C.J.

MAY, 1884.

The sale of a sugar plantation set aside: it appearing that the grantor was of weak mind, that false representations were made by the grantee, and that there was a failure of consideration.

DECISION OF JUDD, C.J.

The bill before me was filed January 24, 1884. As amended it alleges in substance:

1. That on the 9th April, 1881, John McKeague was possessed of an estate at Heeia, Koolaupoko, Island of Oahu, comprising a valuable sugar plantation.

2. That on the 12th February, 1879, the said McKeague received a severe injury by a fall from his horse, by reason of which his mind became impaired to such an extent as to render his intellect incoherent and his judgment defective so as to unfit him for the transaction of business.

3. That on the 9th of April, 1881, while McKeague was weak and of unsound mind, as above set forth, one Moritz Neisser, who well knew plaintiff's weak and unsound mental condition, fraudulently persuaded and prevailed upon him to enter into a certain agreement in writing as follows:

\* \* \* \* \* \* \*

This was acknowledged before Cecil Brown, notary, on the same day. The agreement referred to as having been executed the same day, was not produced in evidence, but is deemed to be the same in tenor as exhibit "D" referred to later on.

4. The bill further alleges that on the 13th June, 1881, while McKeague was in the same condition of mind above described, the said Neisser in the same way induced McKeague to sign two other agreements marked C and D, respectively, one of which (C) is identical with the agreement of the 9th April except that

the number of shares which McKeague is to have is reduced to 40,000 from 55,000.

The agreement "D" is as follows:

*  *  *  *  *  *  *

(These agreements were extended to August 13, 1882.)

5. The bill further alleges that while Mr. McKeague was still in the condition of mind above described, the said Neisser confederating with other persons to the plaintiff unknown, who well knew his unsound mental condition, persuaded him to execute and deliver a certain indenture by which he sold to the so-called corporation, The Heeia Sugar Plantation Company, all his interest in the said plantation for the nominal consideration of one dollar. (The deed is dated June 30th, 1882, and a copy annexed to the bill and marked exhibit A.)

6. That in order to induce McKeague to execute the above deed, Neisser and confederates represented to him that the so-called Heeia Sugar Co. was incorporated with a capital of one million dollars, represented by 100,000 shares at a par value of $10 per share, and that the stock had been placed upon the San Francisco stock market and sufficient had been sold to place $400,000 in gold coin in the treasury of the corporation, which sum Neisser promised to pay McKeague on his arrival in San Francisco in consideration for the sale of the Heeia Plantation. That McKeague, relying on these false and fraudulent representations, was induced and persuaded to execute and deliver to said Neisser, in Honolulu, on the 30th June, 1882, the deed of the plantation, which Neisser caused to be recorded in the Registry office in Honolulu.

8. That McKeague was induced to execute and deliver the deed to Neisser upon the verbal promise of Neisser to pay him in San Francisco as soon as he should arrive there the sum of $400,000 in gold coin.

That McKeague, relying upon these representations and promises of Neisser, went to San Francisco to receive his money, and demanded of Neisser and the so-called Heeia Sugar Co. in July, 1882, the said sum of $400,000, but the respondents failed to comply with this demand and still so refuse.

9. That by the terms of the deed of the plantation, the Heeia Sugar Plantation Co. did covenant and agree to pay off all the several mortgages resting upon the said Heeia Plantation, but all the said mortgages are still unpaid and uncancelled.

10. That McKeague was beguiled, persuaded and prevailed upon when of weak and unsound mind by the said Neisser and his confederates to sell the plantation, and that they obtained possession of the deed in bad faith.

11. That the Heeia Sugar Plantation was organized and incorporated for deceitful and fraudulent purposes, and to impose upon and defraud plaintiff, and that it is a foreign corporation and has failed to comply with the laws of this Kingdom to enable it to hold and convey real estate within this Kingdom.

12. That on the 15th November, 1882, Neisser and his confederates not having paid McKeague any consideration for the sale of the plantation, did oust and eject him from the plantation and still retain possession of the same.

13. That Neisser and confederates have, since they took possession, manufactured and sold from the plantation, 6189 bags of sugar of the value of $48,350.24, and have sold 300 head of cattle of the value of $8500, also 30 hogs of the value of $400, and have converted the proceeds to their own use and have not accounted to the plaintiff.

14. That on the 1st February, 1883, Neisser fraudulently caused the lease of the lands of the plantation from Mr. and Mrs. C. R. Bishop to McKeague to be cancelled, and obtained a lease of the premises to the Heeia Sugar Plantation Co., dated 23d January, 1883, for a term of twenty-two years, to the wrong and injury of plaintiff. The bill prays for a discovery and account, for an injunction against disposing of any of the plantation property, and for a cancellation of the deed of the 30th June, 1882, as well as of the several agreements, and of the cancellation of the lease of Mr. and Mrs. Bishop to McKeague, etc.

The answer of M. Neisser and of the Heeia Sugar Co. denies that McKeague was impaired in mind or incapable of transact-

ing business, and sets up other matters of defence which will more fully appear when the evidence is being discussed. This case occupied four days in the taking of testimony and argument, and I cannot undertake to give in full all the evidence. I consider it proven by the testimony that the plaintiff, John McKeague, was, prior to a fall from his horse which took place February 12th, 1879, and which injured his head, a man of energetic, good business habits, and competent to manage the affairs of the plantation which he had acquired by long years of industry. Since the injury he was a changed man; his memory was poor; his mind was vacillating; he became neglectful in looking after the details so necessary to ensure the success of a large plantation. From a man of energy he became sluggish, dull and uninterested in what should concern him. It is impossible to say with absolute certainty that this condition is referrable to the injury his brain received from the fall, but many witnesses have testified with such distinctness to the change as occurring about this time, that I cannot resist the inference that it was so occasioned. It does not seem to me that it was the despondency and loss of spirits which overcomes some men when reverses occur in their fortunes. For it does not appear that in February, 1879, the plantation had begun to run down, whereas it is in evidence that in 1880 and 1881, when Macfarlane had the agency, it had run down, and required extensive refits and improvements, and it may be that its condition was occasioned by McKeague's mental condition, which made him neglect the plantation. Dr. Brodie says that McKeague's present condition indicates mental disease, and his many acquaintances who have testified say that his condition in 1881 and 1882 was the same as now, except that one witness, McInerny, says he notices a little improvement at present. McGowan, a nephew of McKeague, and who has been on the Heeia Plantation for some eight years, says that when he first knew McKeague he was energetic and took good care of his plantation, but that after the fall from his horse he was altogether different, forgetful and neglectful, and that he used

skilled and expensive labor, as engineer, blacksmith and sugar-boiler, to irrigate cane after the crop was off, when there was work in the line of their respective trades for them to do in over-hauling and repairing.

Wm. Henry says he has known McKeague for four years; that he was "stupid, had no life, was dead; the men did what they wanted to. He was easily led off by most anybody who came along."

James Dodd says he has known McKeague intimately for ten years. He was industrious and attended strictly to business. Saw him after the accident frequently. He seemed stupid, with no vim; no man in him. He had no memory of being surety on witness' bond. Before the accident his habit was to come to town only on Saturdays after 4 P. M. After the accident he was indifferent and did not seem to realize his responsibility; would stay three or four days in town at a time. Was with him in San Francisco in 1881, at the Grand Hotel. He would sit and sleep half of the time in the room at the hotel; said he came to buy a schooner and kept Captain Whitney as her intended master in San Francisco four weeks at his expense, and paid his passage both ways, saying to me sometimes that he was not going to buy a schooner, and sometimes that he was, and sometimes that he did not know what he would do. At the same time Mr. Dodd says that he had dealings with McKeague in the way of boarding horses for him, and he once swapped horses with him.

M. McInerny says he has known McKeague since 1862. "He was formerly a most excellent planter and a smart business man, second to none in the Kingdom. I consider him not a fit man to transact business since the accident." Two months before the accident witness loaned him $500 for six months; when the note matured witness spoke to him about it. "He did not appear to know anything about it. He said what note? I don't owe you any $500." Two or three weeks later he concluded to pay it. His memory was very defective. Had had a partial paralysis of the tongue, and it was difficult to under-

stand him one or two years ago. Before his accident he could remember everything.

Mrs. Geo. H. Robertson, sister of Mrs. McKeague, was present when his horse stumbled and he fell off, striking his forehead on a stone. He was senseless. A doctor was sent for. McKeague was to have been married that day, and fearing he would die they were married that very night. He was laid up four weeks. He did not look and act as before. He was sleepy and lazy; would say "no, no," and he paid no attention to what we said.

Mrs. McKeague says her husband was a great deal changed since their marriage. He was stupid and would hardly say anything; hardly listened to me; memory not good.

Mr. T. A. Lloyd, the plaintiff's guardian, has known him for fifteen years, and has been his neighbor since 1876. Up to 1879 he was a capable plantation manager, and was looked up to as an authority. There was a marked change after the accident. Saw him the morning after, seemed all stupefied. Took three weeks to complete a cash transaction with him for the purchase of an old mill—would say that he would sell and then that he would not. He would wander. Would forget one week what he had said, and deny it the next week: could get no assessment from him in 1881. In 1882 he lost $200, his books and labor contracts by robbery. Did not realize his loss. At McKeague's request took charge of his books and kept time of men. McKeague would often interrupt me in my work. Took people from the boiling-house and put them in the field. It was all the same to him if they got $10 or $100 per month.

C. E. Williams says, he has known McKeague for over twenty years. That there was a change in his condition after the accident. He had lost his vim; not so energetic as before. His memory was comparatively poor. Has had some small transactions with him since 1879, and there was nothing in these to warrant the opinion that he was a lunatic.

For the defense, Mr. Cecil Brown, the attorney who drew the agreements and the deed between McKeague and Neisser, says

that both McKeague and Neisser gave him the instructions on which to prepare the papers. Considered him capable of attending to business; would not hesitate to transact private business with McKeague if he had any. He was not as active since his fall. His memory seemed the same. I thought it was a foolish piece of business and tried to persuade him out of it, and got others to advise him the same way.

Mr. Henry Macfarlane says he was agent for McKeague's Heeia Plantation in 1881. Did not appear to have much force, was inclined to let matters go. No push in him to shove work as it ought to be attended to. He acted sometimes very silly. If he did not agree with you he would get angry and go off and do just as he thought fit. If he happened to get in a certain track you could lead him. I was not very successful in leading him. I would not like to say under oath that he was not capable of caring for his interests, but it is a matter of some doubt in my mind.

Dr. Kennedy came to me to buy him out for McKeague. I declined and told McKeague to let Kennedy alone. The plantation was run down and it was a poor time to buy Kennedy out. I used all the arguments I could. He said he would not buy, and then bought without my knowledge and gave Kennedy over $40,000. Dr. Kennedy claimed a quarter interest. I thought it was a ridiculous price at the time.

The last time McKeague went to California he took his stallion "King William" with him and said he was going to sell him in San Jose for $10,000. He brought the horse back.

Mr. H. Lose, an employee of H. Hackfeld & Co., says he had frequent business transactions with McKeague in 1879, 1880 and 1881, and saw nothing to make witness believe that he was incapable of managing his business and showed no weakness of mind or loss of memory.

A number of business letters were produced, dated since February, 1879, which witness testifies are in McKeague's handwriting; but both McInerny and Lloyd think they are not, but that the signatures are genuine.

M. Neisser declines to say what McKeague's present mental condition is; says he has had no opportunity of judging during the past year as he has not spoken to him.

The foregoing is an abstract of the most prominent testimony bearing upon the allegation that McKeague's mental condition was unsound and weak.

The result at which I have arrived is not that he is a maniac, but that his mind, since 1879, was no longer a safe guide to his actions, and he was thus in a state peculiarly susceptible to undue and improper influence.

I pass now to the evidence on the subject of these influences.

Mr. Henry says: I had heard about the transaction between Neisser and McKeague, and I told McKeague to have nothing to do with stock matters. He said "that's all right," and then threw it off. This was before the sale. About the time of the sale he talked to Neisser, and Neisser said McKeague was all right. There was $400,000 in California for him as soon as he got there.

Mr. Dodd says that Neisser told him after he came back from San Francisco, that McKeague was to have $100,000, and that McKeague introduced him in San Francisco, in 1881, to several men as the stockholders of the corporation, among them a Mr. Frank. I refer to this as showing that the stockholders as early as 1881 had opportunities for observing McKeague's mind.

Mrs. Robertson says that on the day the deed was signed, Mr. Neisser came to McKeague's house and she asked her sister, Mrs. McKeague, in Neisser's presence, where they were going. Mrs. McKeague replied, we are going to sign our names to the deed of sale of the plantation. I asked: "Mary, is this a good thing, tell me what you are going to do?" Mr. McKeague answered, "Neisser says it's all right." The witness then asked Mr. Neisser if it was all right, and he replied "Yes, it's all right, don't you be afraid. You'll have your money in San Francisco, $400,000. It's ready for you." There is some discrepancy as to the hour of the day when it must have occurred, as Mr. Brown says the deed was signed about noon, and Mrs.

Robertson says it was after dinner, and they dined about 2 o'clock, P. M. Mr. Neisser says he cannot tell if he was at McKeague's house the day the deed was signed, but denies the statement testified to by Mrs. Robertson; but Mrs. McKeague substantiates her sister in this respect, and also says that Neisser told her at Heeia that the stock was sold at $10 a share, and that we were to go to San Francisco and were to get $400,-000 in gold the very day we got there; and that they went to San Francisco to get the money. They did not get the money; Mr. Neisser said "Wait, wait, you'll get your money, don't be in a hurry." We waited there two months. Neisser came the day we left and said: "You go down to Honolulu and I'll come by the next steamer and bring the $400,000." Neisser said "Don't you know you have 55,000 shares at $10 a share, and that's $550,000; $150,000 will pay off all the mortgages and debts and you will have $400,000 left."

Mr. T. A. Lloyd testifies that he understood from McKeague that he was to get $400,000 for a half interest in the plantation from Neisser, and he (Lloyd) tried to get the idea out of McKeague's head. That Neisser knew of his efforts and traced McKeague's coolness towards him to Lloyd's influence, and in consultation told Lloyd that McKeague was not right in his mind; that he better not say anything about it, that it would be all right soon. "I have already broken down twice, and if I break down again the whole thing will be lost." Witness said: "It is a large thing this selling half the plantation for $400,000, when the whole plantation is worth only $200,000." Neisser said: "You don't understand it. McKeague will get his money and that's all you care about, isn't it?" Later, when Captain Ross was put in as manager in place of McKeague, Neisser told Lloyd that he must keep quiet and not say anything. This was in November, 1882, and Neisser said McKeague was not fit to manage a plantation.

Mr. C. E. Williams testifies that in San Francisco he saw Neisser on board a steamer about starting for Honolulu, and on Williams telling him that McKeague was intending to come to San Francisco by the boat leaving Honolulu that day, Neisser

took his valise and came ashore.   He gave a message to Williams for McKeague that "his money was all ready for him."   That it was all right.

Mr. Neisser denies these statements.   I give his evidence in full.

*          *          *          *

Several letters from Neisser to McKeague are filed.   Two of them are dated in 1881, before the first agreement was made. I give a few of them in full.

Alameda, February 10, 1881.

JOHN MCKEAGUE, ESQ.

Dear Sir,—Hoping you are in possession of my last letter, I come up to my promise to keep you posted of my doings.

I stated to you that I succeeded up to last mail in getting nearly $30,000 subscriptions, and to-day I am happy to state that the sum is reaching now nearly $50,000, a proof that I am neither idle nor spending my money for nothing.

Altogether I am very well satisfied with my success so far, taking into consideration that this amount is nearly all composed of small subscriptions, and therefore you can form some idea of the amount of work done.

I am following up the same plan indicated by me in my last letter, and although it is an unpleasant business, still it leads to the end aimed at, and that is the main thing to get at.

I have not the least doubt that I shall carry it through now, but it may take me two or three months longer and will cost more money than expected in consequence, but never mind, the money will come back at the end.

I expect by this mail a letter from you with some remittance, which I need very much as my income, though ample for my family, is not sufficient at present to cover such additional expenses, and I could not carry it through unless assisted by you.

All the stock subscribed to up to now is at the rate of $10 per share which means $400,000 for you, a nice little sum to lay by.

With respect to your lady and hoping you are in good health,

I remain, yours truly,

(Signed)                              M. NEISSER.

Honolulu, March 12th, 1881.

MR. JOHN MCKEAGUE,

Dear Sir,—Considering over the state of your plantation, I. would make to you the following proposition which I think I could carry through with my parties in San Francisco.

Your plantation to be incorporated at San Francisco, with Board of Directors of influential and good standing men, and office there and office here, in 100,000 shares out of which you would receive for your benefit 55,000 shares, which is the controlling interest, and keep the management of the plantation with a salary according to agreement in your hands. No transfer of your leases, stock, etc., or anything else till the 20,000 shares are sold for cash at $5, and the money in the hands of the treasurer, therefore no risk for you if I should fail with my proposition. 25,000 shares to be used for the purpose of getting a good and substantial Board of Directors whose names will influence the sale of the stock and give it a solid standing from the beginning.

STATEMENT OF STOCK.

Incorporation of shares.................................................................................100,000
To John McKeague .........................................................................55,000
" Board of Directors .................................................................25,000
" Working Capital ...........................................................:.............20,000
                                                                                                ———100,000

TREASURY STATEMENT AT THE END OF 1881.

Cash sale of 20,000 shares at $5...............................................................:.................$100,000
700 for sugar crop 1881 at $140................................................................. 98,000
                                                                                                        $198,000
Payment of debt .....................................................................................$35,000
Running expenses ................................................................... 40,000
                                                                                                ——— 75,000
                                                                                                        $123,000
Dividend of $1.00 per share.................................................................... 100,000

Balance in Treasury.......................................................................................$23,000

STANDING OF JOHN MCKEAGUE AT THE END OF 1881.
.Stock valuation—
55,000 shares of stock at $5.00................................................................$275,000
Probable increase of stock by declaring dividends of $1.00.................... 55,000
                                                                                                        $330,000
Cash dividend of $1.00 per share on 55,000 shares................................. 55,000
                                                                                                        $385,000

which would be a clear gain of $170,000 to you as the plan-

tation has no more debts, but $23,000 money at hand to pay the next year's expenses.

If 20,000 shares of this stock can be sold at $5.00 each, your 55,000 shares have decidedly then the same value and could be sold too, if desirable, therefore my valuation.

If a dividend of $1.00 per share is declared, which in this case would actually be the net earning of the plantation, the stock is bound to rise in value by itself, much more so if properly managed by men of standing whose interest is also equally at stake, and therefore is my valuation of your stock as near correct as it can be given at present.

By a consideration of my different statements you will have to admit that you would be the gainer to a great extent and no further trouble about money matters.

An answer at your earliest convenience would oblige me very much, as other parties are also anxious to accept my propositions, but I will only handle in the beginning a few plantations.

Yours respectfully,
(Signed) M. NEISSER.
Please send your letter care of Mr. Bush.

---

Alameda, January 14th, 1882.
JOHN McKEAGUE, ESQ., Honolulu.

Dear Sir,—Having arrived here on the 28th of last month after a pleasant voyage, in good health, I found very soon the change in the climate rather unpleasant, and I am suffering up to date from a severe cold.

In regard to our corporation scheme I found very soon out that all the parties which had promised to invest money had a great deal to say, but that is all they ever done or ever will do in this matter, as they are afraid of King Spreckles. Grinbaum, with all his promises, has done nothing yet, although I believe he will come in by-and-by.

As soon as this state of affairs was sufficiently clear to my mind, I went my own way to entire different parties and suc-

ceeded so far beyond my expectations, and have not the least doubt of carrying it through.

I have now from different parties the amount of $30,000 subscribed, all new parties, and Messrs. Fernbach and Landsberger cannot understand how I was able to succeed so quick. Nevertheless, I am fully aware that the hardest work is still before me, and that it will not only require all my energy but a great deal of time and money.

In order to see and meet the different parties, I resort to small invitations for private dinners, etc., which is all that is necessary to make them feel good, and in that way I force them to listen to me long enough to convince them of my benevolent intentions towards them in letting them have a few hundred shares.

Our business men here are so busy during the day that you never can talk with them and consequently cannot succeed with anything of that kind, therefore I adopt the means which promise success, which are expensive but apparently work the best. We have so far not fixed the price of the stock, $5 will be the lowest, but we will probably raise it to $7.50 or even $10, but that will be decided as soon as I have the full amount subscribed.

I consider it my duty to inform you of my doings and hope you will be pleased so far, knowing very well that I am working in your interest here, and I can assure you that without my doing so here the whole affair would have ended in smoke.

I have no doubt that I will have to remain here two months, may be three months longer, and I must confess that I don't see how I can do it with the means at my hand, figuring up the amount already spent. When I left Honolulu I was prepared to use $500 of my own money, and thought that with the $500 from you I would have sufficient to carry it through. Now I am fully convinced that I will require twice the amount, and as I alone cannot afford it to spend from my own means, I must request you to pay your share towards the expenses, as without money nothing can be done. You have without doubt seen

enough during your visit here that San Francisco for such purposes is an expensive place, and that money alone judiciously spent will carry it through.

I expect next steamer, therefore, a draft on San Francisco in favor of Moritz Neisser, to assist me in carrying it through. If we make the stock $10 your share will be $400,000, twice as much as agreed upon, but that will not depend on me alone.

With my respect to Mrs. McKeague, I remain, with the expectation of your letter by next steamer without fail,

Yours truly,

(Signed)                MORITZ NEISSER.

Alameda, California.

---

Alameda, March 10, 1882.

JOHN McKEAGUE, ESQ., Honolulu.

Dear Sir,—Yours of the 11th February, with enclosure, came duly to hand, and I herewith express my thanks to you for the prompt attendance.

I am sorry to say that I was prevented from making any headway in our scheme on account of sickness; I had contracted a very severe cold one night coming home late, which compelled me to stay at home a good deal of the time, and preventing me from working in the usual way.

I think we shall take your advice, which is our opinion also, and incorporate now very soon, as the stock will sell then more easy, as in reality the company would not require the whole amount at once, as the mortgage of Isenberg is only due in September; and if the company has now sufficient money on hand to pay off all debts outside of this it would do just as well.

The present agitation in Congress against the treaty, with the most sure prospect of abrogation, is at any rate a large drawback for the sale of stock, while hereafter, if decided for or against the treaty, the people will look at the matter in a different light, and will come to the conclusion that plantations will probably not pay so big as heretofore, but still are a paying, legitimate investment at any rate.

Please sign the inclosed paper and have it certified to before a Notary Public. I might require it to show to some of the directors my authority to incorporate.

With regards to your family, I remain yours truly,

(Signed)                    M. NEISSER.

Please direct your letter to M. Neisser, Alameda, California.

Mr. Fernbach has moved his office, and sends his best regards. Please answer by return of mail.

---

                                    Alameda, April 10, 1882.

JOHN MCKEAGUE, ESQ., Honolulu.

Dear Friend,—Hoping you are in possession of my last letter by steamer, you will have seen how far I have succeeded in our enterprise, and for to-day I can state to you that we only are waiting for the paper sent to you in my last letter, to go ahead at once with the incorporation. Some of the parties acting as directors, men with money, will not do anything further unless I can produce to them your consent for the extension of time, and, as everybody else would most likely raise the same objection, we will have to wait until we receive from you the requested paper.

My health is very poor since I am here, and if it was not for this affair, which I intend to finish now, I would have been down at the Islands long ago; the weather all along has been very rough and cold, and any amount of rain. At any rate, as soon as the affair is fully settled up, I shall return to the Islands and see you.

Please give my respect to your lady. Hoping this will meet you in good health, I remain yours truly,

(Signed)                    M. NEISSER,

                                    P. O. Alameda.

---

The conclusion I have arrived at is that M. Neisser, by his oft repeated promises, induced McKeague to believe that he would

sell the 40,000 shares which was to be his interest in the incorporated company, that is, two-fifths of the whole, for $10 a share and thus realize $400,000, and these alluring statements, made to McKeague while his mind was enfeebled and his judgment not good, entirely captivated him, and induced him to sign away his property against the remonstrances of his friends.

The case of *Harding vs. Handy,* 11 Wheaton, 103, is authority for the proposition that equity will set aside a conveyance obtained by undue influence from a person who was so infirm in body and mind from old age and other circumstances, as to be liable to imposition, although his weakness does not amount to insanity.

The moving cause creating the infirm condition of mind may be old age, or it may be disease or injuries or any agency, even an unknown one, but if equity finds from the facts and circumstances that advantage was taken of a weak intellect to press and secure an unconscionable bargain, it will annul it.

The transaction between McKeague and Neisser has resulted as follows: McKeague, considering only the uncontested facts, conveyed his plantation to a corporation in San Francisco for the consideration of 40,000 shares out of 100,000, that is two-fifths of the whole, and the agreement of the company to pay off the existing mortgages. In default of language in the agreement distinctly limiting the time when the mortgages should be paid, I hold that it is to be taken that the company agreed to pay the mortgages when they became due. In the case of the first mortgage of $30,000 to H. Hackfeld & Co., and assigned to P. Isenberg, it is overdue as appears by the certificate from the Registrar's office, and it is not paid, and this shows a failure of consideration in the deed.

It seems to me that the requiring McKeague to surrender in San Francisco 20,000 shares of the stock to be kept as collateral security for the payment of the Kennedy mortgages, was an act of bad faith and a wrong.

It is testified by Mr. Brown that Neisser knew of the Kennedy claim April 9th, 1881, when the first agreement was made.

33

Neisser says he knew of it when the deed was signed, June 30, 1882, and the deed itself recites the Kennedy mortgage of $54,500.

McKeague was not bound by any principle of law or justice to give up one-fifth of the stock of the corporation to secure the payment of a mortgage which the corporation had agreed to pay, and a man of ordinary sense and judgment would not have allowed himself to be thus managed.

Another circumstance showing the facility with which McKeague was induced to deliver the deed, and how completely he trusted Neisser, is as follows: The agreement of April 9th, 1881, and of June 13th, 1881, both stipulated that upon showing and proof to McKeague "that there is a sum of not less than $100,000 in the treasury, that he will sign, execute and deliver a good and valid deed," etc., and yet McKeague, in spite of the caution of Mr. Brown not to deliver the deed until the stock had been handed to him, passes it over directly after its execution to Neisser, and there is no proof that McKeague ever inquired if this sum of $100,000 or any part of it was in the treasury. Mr. Neisser on being asked if there was ever this sum in the treasury, replied that he was not the treasurer and did not know, and yet he says that McKeague's receipt for the 40,000 shares of stock shows that they were from him (Neisser), in order that he might have proof that he had carried out his agreement, and he ought to have known the facts.

It is remarkable that no one knows where McKeague's remaining 20,000 shares are. Mr. Neisser, however, says that the shares, though of the nominal par value of $10, are not even quoted on the stock market, and there is no evidence that they ever have been.

This leads me to say that the agreement is broken in another respect, and that consequently the consideration in the deed has failed, for by the agreement Neisser agreed not merely to incorporate the Heeia Sugar Plantation under the laws of the State of California, but to place the stock of the corporation upon the market of San Francisco, through the agency of the San Francisco Stock Exchange Board.

If to "place" stock means to sell it, there is a plain failure of consideration.

But I am of the opinion that outside of the written agreements and the facts admitted by the defence, it is well proved that Neisser induced McKeague to part with his property by means of the promise that he would sell the stock for him at par and have the sum realized, $400,000, ready for him in San Francisco —an idea which no sensible man would for a moment believe to be possible, considering that the plantation was worth say $150,000 and had mortgages on it to the amount of about $125,000. To realize $400,000 for McKeague alone, to say nothing of the other three-fifths of the stock, out of a property worth only about $25,000 clear, would imply that the public of San Francisco were to be swindled to accomplish this result.

Mr. Neisser made these assurances not only to McKeague but to his friends, undoubtedly to disarm them and to prevent them from dissuading McKeague from withdrawing from the bargain.

I look upon Neisser's getting McKeague over to San Francisco as suspicious. It was most useless and foolish for him to undergo the expense and loss of time of this voyage when the shares or the money for them could have been remitted to Honolulu. I cannot avoid the conclusion that the defendant wished to have McKeague where he could be operated upon away from the influence of his friends.

Upon a review of the whole case I am of the opinion that the bargain was against equity and good conscience and ought to be annulled, and I also find that the corporation defendant is not an innocent purchaser for value, and is not protected so far as the sale of the plantation is concerned. The cancellation of the lease to McKeague must also be annulled. But the corporation has expended sums of money in the improvement and development of the plantation, and it is clearly established by the evidence that the condition of the plantation now is much better than when the sale was made, and mortgagees whose money has been faithfully expended on the plantation should also be protected.

A reference should be made and an account taken, and a decree will be made after counsel have been heard.

There was a point made by counsel for the plaintiff that the corporation herein has failed to comply with the laws of this Kingdom so as to enable it to hold real estate and transact business in the Kingdom. An examination of the papers filed in the Interior Office discloses that they were so filed within the time prescribed by the statute. It is not necessary that they be filed by some person holding a power of attorney for that purpose.

The corporation did not, however, file a statement of its assets and liabilities on the 1st July, 1883. This being a condition subsequent, it has no effect upon the validity of the deed of June 30th, 1882. It can only affect the acts of the corporation subsequent to the failure to file, if at all.

*J. M. Davidson,* for plaintiff.

*P. Neumann & E. Preston,* for defendant.

Honolulu, May 14th, 1884.